UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MICHAEL STEVEN SOKOLOWSKI,

                    Plaintiff,

                                              Case No. 21-cv-1245-pp
        v.

PRAPTI KUBER, JUSTIN RIBAULT
and STEPHEN MCCULLEN,

                    Defendants.

**ORDER GRANTING DEFENDANTS' UNOPPOSED MOTION FOR SUMMARY
JUDGMENT (DKT. NO. 37), RELINQUISHING SUPPLEMENTAL
JURISDICTION OVER STATE LAW CLAIM AND DISMISSING CASE**

        Plaintiff Michael Steven Sokolowski, a formerly incarcerated person

representing himself, is proceeding under 42 U.S.C. §1983 on Eighth

Amendment claims against two doctors and a nurse at Racine Correctional

Institution. The defendants have moved for summary judgment. Dkt. No. 37.

The plaintiff has not responded to or opposed the motion. The court will grant

the defendants' unopposed motion and dismiss this case.

**I.      Facts**

        A.      <u>Procedural Background</u>

On October 25, 2021, the court received the plaintiff's complaint

asserting claims against Doctors Prapti Kuber and Justin Ribault and nurse

Steven McCullen. Dkt. No. 1. On December 6, 2021, the court received the

plaintiff's motion to amend his complaint, which sought only to add a claim for

relief to the original complaint. Dkt. No. 10. The court granted the motion to

amend, screened the complaint and allowed the plaintiff to proceed on claims of inadequate medical treatment against the defendants. Dkt. No. 13.

On November 22, 2022, after the defendants had filed their answer to the complaint, the court issued a scheduling order, setting deadlines for the parties to complete discovery and file dispositive motions. Dkt. No. 18. A few weeks later, the court received from the plaintiff a motion asking the court to reset those deadlines because he expected to be released from prison on February 14, 2023. Dkt. No. 19. He said he was preparing an amended complaint that he planned to file after his release. Id. The court granted the plaintiff's motion and extended the parties' deadlines to complete discovery and file dispositive motions on the merits of the plaintiff's claims. Dkt. No. 20. The court ordered the plaintiff to file his amended complaint by March 16, 2023. Id. at 2.

On March 20, 2023, the court received from plaintiff a motion for leave to amend his complaint, dkt. no. 22, and a notice that he had been released from prison, providing his new address in West Allis, dkt. no. 23. On July 6, 2023, the court granted the plaintiff's motion for leave to file an amended complaint and ordered the clerk to docket his proposed amended complaint (Dkt. No. 22-1) as the operative complaint. Dkt. No. 25. The court pointed out that the plaintiff had "not timely filed" the amended complaint by the March 16, 2023 deadline, but it extended the plaintiff leniency because he is representing himself. Id. at 3–4. The court detailed the allegations in the proposed amended complaint and determined that it did not state a claim against any new defendant. Id. at 4–7. The court did not allow the plaintiff to proceed against

any new defendants but did allow him to add a state law claim of medical malpractice against the three existing defendants. Id. at 7–8. The defendants timely filed their answer to the amended complaint. Dkt. No. 27.

On September 7, 2023, the defendants moved to dismiss for the plaintiff's failure to cooperate in discovery; in the alternative, they asked the court to compel the plaintiff to sign an authorization to release his medical records. Dkt. No. 28. The court ordered the plaintiff to respond to the motion within twenty-one days and stayed the dispositive motion deadline pending its decision on the defendants' motion. Dkt. No. 30. The plaintiff timely responded and averred that he had twice sent the defendants a signed medical authorization. Dkt. No. 31. He also attached a third signed authorization form. Dkt. No. 31-1. The court denied the defendants' motion to dismiss as moot because the plaintiff's response showed that he had sent the signed authorization to the defendants three times, including once in his court filing. Dkt. No. 32.

The court ordered the parties to file dispositive motions by December 22, 2023. Id. at 5. The court twice granted the defendants' requests to extend that deadline. Dkt. Nos. 34, 36. On January 19, 2024, the court received the defendants' motion for summary judgment and supporting materials. Dkt. Nos. 37–41. On January 22, 2024, the court issued an order directing the plaintiff to respond to the defendants' motion by the end of the day on February 20, 2024. Dkt. No. 42. The court advised the plaintiff,

> If the court has not received the plaintiff's written response in
> opposition to the defendants' summary judgment motion by

February 20, 2024, the court has the authority to treat the defendants' motion as unopposed, accept all facts the defendants assert as undisputed and decide the motion based only on the arguments in the defendants' brief, without any input from the plaintiff. That means the court likely will grant the defendants' motion and dismiss the case.

Id. at 2.

The February 20, 2024 deadline passed some time ago, and the court has not received the plaintiff's response or any filing explaining why he was not able to file it by the deadline. The court has not heard from the plaintiff since September 14, 2023, when he filed his response to the defendants' motion to dismiss or compel. The court's order telling the plaintiff to respond to the defendants' motion for summary judgment was not returned to the court as undeliverable, and the court has no reason to believe he did not receive it at the address in West Allis that he provided to the court in March 2023. The court previously sent orders to that address, and the plaintiff received and responded to them. On March 5, 2024, the defendants filed their reply brief, which reported that the plaintiff had not responded to their motion and asked the court to accept their proposed facts as undisputed and grant their motion. Dkt. No. 43.

The court will enforce its previous order, consider the defendants' proposed facts to be undisputed and consider the assertions in the defendants' brief to be unopposed for purposes of this decision.

B.   Factual Background

1.   *The Amended Complaint*

The plaintiff alleges that on March 19, 2021, he was transferred to Racine from Dodge Correctional Institution, where doctors had diagnosed him with acute prostatitis, prescribed Ciprofloxacin and Finasteride and referred him to a specialist. Dkt. No. 26 at ¶¶2–5. On March 30, 2021, the plaintiff requested an appointment with the Health Services Unit ("HSU") at Racine to address recurring pain in his penis that he believed was associated with his prostatitis. Id. at ¶7. The plaintiff saw a nurse who referred him for an appointment with a doctor. Id. at ¶8.

On April 20, 2021, the plaintiff saw Dr. Kuber about his pain, but she allegedly told the plaintiff that "he did not have prostatitis because he was to[o] young." Id. at ¶9. The plaintiff reported that his symptoms had subsided and asked whether he should continue taking the Finasteride. Id. Kuber allegedly "shook her head no" and told the plaintiff that if his symptoms reappeared, he should write to the HSU and she would put him back on Finasteride. Id. The plaintiff alleges that in rendering her decision, Kuber did not conduct an examination, run any tests or consider his previous diagnosis. Id.

The plaintiff alleged that his pain returned about two weeks later, so he filed an appointment request with the HSU. Id. at ¶11. On May 21, 2021, the plaintiff saw Nurse McCullen, who advised him against seeing a provider who he said "were gonna stick a camera up [the plaintiff's] penis." Id. at ¶14. The plaintiff says McCullen provided "[n]o effective care." Id. The plaintiff alleges

Case 2:21-cv-01245-PP   Filed 06/12/24   Page 5 of 34   Document 44

that he again saw McCullen on June 7, 2021, and that McCullen merely told him that "he had a provider appointment in two weeks" and provided no treatment. Id. at ¶19.

On June 14, 2021, the plaintiff again saw Dr. Kuber, but she dismissed the plaintiff's concerns and told him, "stop it your [*sic*] fine, your [*sic*] imagining the pain it's all in your head, you should seek out psych services for anxiety." Id. at ¶20. On July 14, 2021, another incarcerated person brought the plaintiff in a wheelchair to the HSU to see Nurse McCullen because his pain made walking difficult. Id. at ¶¶21–22. McCullen allegedly refused to listen to the plaintiff's complaints, sent him back to his unit without treatment and noted in the plaintiff's medical chart that "his symptoms were related to masterbating [*sic*] which was untrue." Id. at ¶¶23–24.

On July 19, 2021, the plaintiff saw Dr. Ribault, detailed how his pain had spread to his testicle "and in between his scrotum and anus" and asked about his referral to a specialist. Id. at ¶¶25–26. Ribault allegedly told the plaintiff that "a urology consult is not indicated at this time." Id. at ¶26. The plaintiff says that during a visit with medical staff on August 10, 2021, Nurse McCullen "burst into the room yelling" and threatened to "get a[n] officer back here." Id. at ¶29. He alleges that on August 13, 2021, a nurse sent the plaintiff to the hospital without first seeing a doctor, and the plaintiff was diagnosed with epididymitis. Id. at ¶33.

The court detailed additional allegations of the amended complaint in its July 6, 2023 order:

[The plaintiff] newly alleges that on December 1, 2021, Nurse Moore (who is not a defendant) notified Dr. Ribault that the plaintiff had "high levels of occult and bilirubin in his blood and a risk of serious injury and his response was noted." The plaintiff says Dr. Ribault did not send him to a urologist for eight months, at which time he was diagnosed with chronic prostatitis. He alleges that this delay worsened his symptoms and demonstrates Dr. Ribault's deliberate indifference to the plaintiff's serious medical condition. He says Dr. Ribault refused to see him for treatment in January and February 2023, and he again refused to allow the plaintiff to see a specialist.

Dkt. No. 25 at 4–5 (internal citations omitted).

### 2. The Defendants' Undisputed Facts

At all relevant times, Drs. Kuber and Ribault were employed as doctors at Racine, and Nurse McCullen was employed as a registered nurse. Dkt. No. 39 at ¶¶2–3. The defendants detail how medical staff provide care to incarcerated persons at Racine. Id. at ¶¶5–8. Advanced care providers, such as doctors, are responsible for treatment decisions and patient care plans. Id. at ¶6. They may refer a patient to an offsite provider but are not bound by any recommendation that the offsite provider makes. Id. at ¶¶6–7. Nurses have no authority to override orders from advanced care providers, and they cannot write prescriptions or refer patients to offsite specialists. Id. at ¶8.

### a. Dr. Kuber

Dr. Kuber provides an overview of the plaintiff's medical treatment at Racine. Dkt. No. 41. She avers that HSU staff saw the plaintiff on March 19, 2021, the day he arrived at Racine, and reissued his medications (including Finasteride and Ciprofloxacin). Id. at ¶6. On March 31, 2021, another nurse saw the plaintiff for his complaints of prostate pain and burning when he urinated. Id. at ¶7. The plaintiff reported improvement in his pain after he

7

received antibiotics at Dodge on March 17, 2021, but the pain and burning returned when he masturbated. Id. at ¶8. The nurse advised the plaintiff to drink fluids and scheduled him for a follow-up appointment. Id. at ¶9.

Dr. Kuber first saw the plaintiff on April 20, 2021. Id. at ¶10. The plaintiff reported a previous diagnosis of an enlarged prostate, but during this appointment he did not complain about pain or burning, hesitancy while urinating or other symptoms. Id. at ¶11. The plaintiff opined that his symptoms were "related to him over masturbating in the county jail," but "he has found significant improvement in symptoms" since he stopped. Id.; Dkt. No. 40-1 at 62. He told Kuber "that he has not found any difference with or without the medications." Dkt. No. 40-1 at 62. Kuber ordered a urinalysis and a urine culture to determine if there were signs of infection or pathology related to the plaintiff's prostate. Dkt. No. 41 at ¶12. She discontinued Finasteride because the plaintiff said he stopped taking it. Id. at ¶13. Kuber also ordered a thyroid test and a complete blood count with a basic metabolic panel. Id. at ¶14. Kuber avers that those tests would form "a starting point to track progress and tailor strategies" for the plaintiff because he was a new patient. Id. She declined to order an "uncomfortable and invasive" digital rectal examination of the plaintiff's prostate because he reported that his symptoms had improved. Id. at ¶15. She noted that given his symptoms, the plaintiff could be suffering from Benign Prostatic Hyperplasia, rather than prostatitis. Id. at ¶¶17–19.

On May 20, 2021, the plaintiff filed a request for medical services complaining about prostate problems and trouble urinating. Id. at ¶20. Nurse

McCullen attempted to see him the next day, but the plaintiff refused the appointment when told he would have to pay a copayment. Id. at ¶21; Dkt. No. 40-1 at 50. McCullen reminded the plaintiff that he had an upcoming provider appointment. Dkt. No. 41 at ¶21. On May 27, 2021, the plaintiff underwent a urinalysis, which was negative for an infection. Id. at ¶22; Dkt. No. 40-1 at 68. Dr. Kuber's declaration cites "HSU326" in support of this statement, but that page is not in the plaintiff's medical records the defendants submitted with their summary judgment materials. Dkt. No. 41 at ¶22.

On June 7, 2021, Nurse McCullen saw the plaintiff for a sick call appointment for his complaints about pain and issues urinating. Id. at ¶23; Dkt. No. 40-1 at 36–37. Dr. Kuber avers that the plaintiff "complained his penis hurt after masturbating and then urinating, his urine stream was weak, and he had problems urinating early in the morning and at night." Dkt. No. 41 at ¶23. But the pages of the plaintiff's medical records that she cites in support of those statements do not include the referenced information. McCullen's progress notes from the June 7, 2021, appointment are cut off after about one page, see dkt. no. 40-1 at 36–37, and the plaintiff's HSU request form says nothing about masturbating, dkt. no. 40-3 at 69. The plaintiff's request says, "I'm still in pain. It's hard to urinate at times. I've been seen several times with no real effort to rectify the situation, only excuses. Something is wrong with me and you clearly don't have the ability to find out what it is." Id. McCullen responded to the plaintiff's request the same day and saw him in person, as

discussed above. Id. His response says, "Talked about labs [and] urine sample and agreed to wait to be seen by provider within 2 weeks." Id.

Dr. Kuber avers that during the June 7, 2021 appointment, Nurse McCullen noted that the plaintiff had seen Kuber two months earlier for the same issue, and that there were no changes to his complaints. Dkt. No. 41 at ¶24. But the pages she cites in support of this statement refer to a "Vital Signs Check" McCullen had with the plaintiff on May 13, 2021, not June 7, 2021. Id. (citing "HSU424-425"); see Dkt. No. 40-2 at 42–43 (HSU 0424–25). Kuber then says that McCullen instructed the plaintiff "to stop masturbating, avoid getting soap in his urethra, and reminded [him] he had a provider appointment within the next two weeks." Dkt. No. 41 at ¶25 (citing "HSU75-76"). As the court just noted, these pages of the plaintiff's medical records are cut off and do not contain McCullen's summary of the visit, which it appears the defendants failed to include with their exhibits. See Dkt. No. 40-1 at 36–37.

Dr. Kuber avers that on June 14, 2021, she saw the plaintiff for a follow-up appointment and explained that his labs were within normal ranges. Dkt. No. 41 at ¶27. The plaintiff expressed having urinary hesitancy but no burning, pain or discharge when he urinated. Id. He believed that "something is wrong with his prostate." Id.; Dkt. No. 40-1 at 61. But he also admitted to worrying "a[]lot . . . may [have] some anxiety" that was never clinically treated. Dkt. No. 40-1 at 61. Kuber encouraged the plaintiff to "redirect his thoughts, engage in other activities which may help resolve the symptoms altogether." Id. The plaintiff agreed with that plan of care. Id. Kuber notes that patients with

urinary hesitancy but no accompanying pain "can benefit from redirecting their thoughts away from their preoccupation about their failure to urinate." Dkt. No. 40 at ¶29. She avers that their anxiety can overstimulate their nervous system, leading "to tension in the pelvic area and bladder and an involuntary urge to tense the muscles in that area making urination difficult." Id. Kuber did not believe additional tests were necessary because the plaintiff had no new symptoms. Id. at ¶30.

Kuber resigned from Racine at the end of June 2021 and had no further interaction with the plaintiff. Id. at ¶31.

### b.    Dr. Ribault

Dr. Ribault began seeing the plaintiff after Dr. Kuber resigned in June 2021. Dkt. No. 40 at ¶9. His first appointment with the plaintiff was on July 19, 2021. Id. at ¶11; Dkt. No. 40-1 at 60–61. The plaintiff complained of pain in his penis and scrotum and "tingling around anus." Dkt. No. 40-1 at 60. He denied masturbating in the three previous weeks and reported, contrary to what he told Kuber, that he had no pain when he was taking Finasteride. Id. Ribault agreed with Kuber's conclusion that the plaintiff was suffering from Benign Prostatic Hyperplasia. Id. at 61; Dkt. No. 40 at ¶14. He prescribed Finasteride daily for 350 days and scheduled a follow-up for two to three months and again after one year. Dkt. No. 40-1 at 61. Ribault avers that he did not schedule a urology consult because the plaintiff's symptoms could be treated with medication at the institution. Dkt. No. 40 at ¶17.

11

On August 10, 2021, the plaintiff saw a registered nurse for complaints of pain in his right testicle and into his groin. Id. at ¶18; Dkt. No. 40-1 at 33–36. The plaintiff reported that the pain was worse "after strenuous activity or masturbation," and he complained that the Finasteride was not working. Dkt. No. 40-1 at 33–34. The nurse consulted with Dr. Ribault, who ordered Terazosin for 350 days to relieve the plaintiff's symptoms and relax his muscles. Id. at 36; Dkt. No. 40 at ¶19. He also ordered a urology consult "as a precautionary measure" because the plaintiff reported that the Finasteride was not working. Dkt. No. 40 at ¶20.

Two days later, a different nurse saw the plaintiff for continued complaints of groin and testicle pain. Id. at ¶21; Dkt. No. 40-1 at 49. She explained that the new medication (Terazosin) would take time to have effect, and she gave the plaintiff ibuprofen for pain in the meantime. Dkt. No. 40 at ¶21; Dkt. No. 40-1 at 49. Dr. Ribault avers that he ordered a Prostate Specific Antigen test because the plaintiff was concerned about prostate cancer. Dkt. No. 40 at ¶22. He did not believe the test was necessary given the plaintiff's age and lack of symptoms but ordered it "per his insistence." Id.; Dkt. No. 40-1 at 53. Ribault avers that the test results showed the plaintiff's levels were normal. Dkt. No. 40 at ¶22; Dkt. No. 40-1 at 53.

Later that same day—August 12, 2021—another nurse saw the plaintiff for complaints of pelvic pain. Dkt. No. 40 at ¶23; Dkt. No. 40-2 at 42. She consulted with Dr. Ribault, who ordered a pelvic ultrasound to exclude possible causes of the plaintiff's pain, including his concern that he had a hernia. Dkt.

No. 40 at ¶23; Dkt. No. 40-2 at 42. At around 10:00 p.m. that evening, a third nurse saw the plaintiff for complaints of worsening pain in his testicle and groin. Dkt. No. 40 at ¶24; Dkt. No. 40-1 at 49. The nurse noted that the plaintiff's right testicle and right groin appeared to be larger than the left, but she was unsure if that was abnormal for him. Dkt. No. 40-1 at 49. The nurse noted the plaintiff's order for an ultrasound, issued him an athletic support belt, referred him for a doctor's appointment as soon as possible and advised him to avoid strenuous activity and to continue taking pain medications and applying topical medication for his pain. Id.

The next day—August 13, 2021—the same nurse again saw the plaintiff for his complaints of pain in his right testicle, which was enlarged, and groin and prostate pain. Dkt. No. 40 at ¶27; Dkt. No. 40-1 at 48. The nurse decided the plaintiff should be sent to the emergency room for further evaluation. Dkt. No. 40-1 at 48. Hospital staff performed lab tests and a urinalysis, which were normal, but the ultrasound they performed suggested the plaintiff had epididymoorchitis. Dkt. No. 40 at ¶30; Dkt. No. 40-2 at 20–28. The emergency room provider recommended an antibiotic and Tylenol for pain. Dkt. No. 40 at ¶30; Dkt. No. 40-2 at 27–28. Dr. Ribault explains that epididymoorchitis is "the sudden swelling of both the epididymis and the testicles generally caused by a bacterial infection." Dkt. No. 40 at ¶31. He notes that it can cause lasting discomfort even after a full course of antibiotics and it can take months for swelling to ease. Id. Following the plaintiff's hospitalization, a nurse ordered prescriptions for antibiotics to treat the plaintiff's condition. Id. at ¶¶32–33.

Ribault cancelled the order for an ultrasound because the hospital had performed one. Id. at ¶34.

On August 26, 2021, Dr. Ribault saw the plaintiff for a follow-up and because the plaintiff had complained about his pain returning after he stopped taking the antibiotics. Id. at ¶36; Dkt. No. 40-1 at 59. Ribault explained that the plaintiff's varying and inconsistent complaints of pain made it difficult to diagnose a clear source. Dkt. No. 40-1 at 59. He noted that the ultrasound showed epididymitis, which "must be the cause of symptoms and it should not be considered that another diagnosis was missed." Id. Ribault offered various treatments including Motrin, ice and antibiotics, but he observed that it could take weeks for the plaintiff's symptoms "to drastically improve." Id. He also ordered Ciprofloxacin, ibuprofen and an ice bag. Id. at 59–60.

On September 15, 2021, the plaintiff saw a nurse and reported improvement of his symptoms. Id. at 47. But he reported "a 'funny, burning ache in penile area,'" and "an intermittent quick sharp pain that goes away in his pelvic area." Id. The nurse advised the plaintiff to continue taking his medications, drink water and contact the HSU if he had concerns. Id. The nurse contacted Dr. Ribault because the plaintiff asked to change his prescription of ibuprofen to Extra Strength Tylenol. Id. at 52. Ribault approved the change and ordered acetaminophen 500mg for pain. Id. at 52, 75. On September 24, 2021, the plaintiff saw a nurse for continued, intermittent pain and discomfort in his penis, groin, pelvis, scrotum and rectum. Id. at 47. The nurse advised the plaintiff to continue taking his medications, provided him a

scrotal support and encouraged him to drink fluids and avoid contact sports or strenuous activity. Id.

Dr. Ribault saw the plaintiff again about two weeks later, on October 8, 2021. Id. at 58. He reviewed the plaintiff's past treatment and noted that it was "unclear what the cause [was]" of the plaintiff's pain. Id. Ribault referred the plaintiff to a urologist because his labs were normal, and "institutional medical options were exhausted." Id.; Dkt. No. 40 at ¶48. In the meantime, he ordered Ciprofloxacin to treat the plaintiff's symptoms. Dkt. No. 40 at ¶49; Dkt. No. 40-1 at 59. The plaintiff underwent a urinalysis on November 2, 2021, which was negative for infection. Dkt. No. 40 at ¶50; Dkt. No. 40-2 at 31–32.

On November 8, 2021, the plaintiff saw a urologist at All Saints Hospital for his complaints of chronic pain. Dkt. No. 40 at ¶51 (citing Dkt. No. 40-2 at 14–19). The urologist noted that he did not "see any obvious GU [genitourinary] issue." Id. He recommended a CT scan and Cystoscopy procedure to gather more data but did not prescribe any medications, including antibiotics or Flomax. Id.; Dkt. No. 40-2 at 14.

On December 1, 2021, the plaintiff saw a nurse at Racine for complaints of worsening pelvic and penis pain. Dkt. No. 40 at ¶52; Dkt. No. 40-1 at 29–32. The nurse noted a possible small hernia in the plaintiff's groin and instructed him to continue his treatment as prescribed. Dkt. No. 40 at ¶52; Dkt. No. 40-1 at 32. The nurse messaged Dr. Ribault about the hernia and noted that a urinalysis suggested "occult blood" or blood in his urine in an amount "too small to be seen without a microscope." Dkt. No. 40 at ¶53; Dkt. No. 40-2 at

46. The nurse noted that the plaintiff had a December 6, 2021 appointment with offsite urology. Dkt. No. 40-2 at 46. Ribault noted these concerns. Id.

Dr. Ribault does not say anything about any December 6, 2021 appointment, but the plaintiff's medical records show he had a "Vital Signs Check" with a nurse that day. Id. at 40. On December 8, 2021, the HSU received a request from the plaintiff complaining that he "was never taken" for his urology appointment on December 6, 2021, and that the HSU "lied and said no appt. was made yet." Dkt. No. 40-3 at 31. The same day, the plaintiff saw a registered nurse about his request. Dkt. No. 40-1 at 46. The nurse "explained the off-site appointment procedure" and advised the plaintiff to be patient. Dkt. No. 40 at ¶54; Dkt. No. 40-1 at 46. The plaintiff "verbalized understanding" and denied having new or worsening concerns or symptoms. Dkt. No. 40-1 at 46.

On December 13, 2021, the plaintiff saw a nurse about his ongoing pain. Dkt. No. 40 at ¶55. The nurse messaged Dr. Ribault about the plaintiff's complaints, which now included constant low back pain that radiated to the front of his body when he urinated. Id. at ¶56; Dkt. No. 40-2 at 45. Ribault confirmed that the plaintiff's complaints were stable and that he had no new reported symptoms. Dkt. No. 40 at ¶57; Dkt. No. 40-2 at 45. Three days later, the plaintiff saw another nurse for complaints of pain in his pelvis and abdomen. Dkt. No. 40 at ¶58. She advised him to continue his medications and drink fluids. Id.; Dkt. No. 40-3 at 27. The plaintiff had asked to see a doctor and not a nurse "because all they do is take [his] vitals, that's not helping [him]." Dkt. No. 40-3 at 27. The plaintiff underwent another urinalysis, which

was negative. Dkt. No. 40-2 at 30–31. Ribault ordered additional ibuprofen for the plaintiff. Dkt. No. 40 at ¶60; Dkt. No. 40-1 at 74.

On January 21, 2022, Dr. Ribault sent a letter to the plaintiff notifying him that a CT scan and urology consultation were "in the works." Dkt. No. 40 at ¶61; Dkt. No. 40-2 at 49. He explains that offsite appointments are scheduled based on the outside provider's discretion and availability. Dkt. No. 40 at ¶62. The plaintiff underwent the CT scan on his abdomen and pelvis on February 25, 2022, which showed normal results. Id. at ¶65; Dkt. No. 40-2 at 36–38. Nurse McCullen noted in the plaintiff's records that on March 1, 2022, a "provider letter was sent" from Ribault to the plaintiff informing him of those results and that he had a pending urology follow-up. Dkt. No. 40-1 at 45; Ribault ordered additional medication to manage the plaintiff's pain. Dkt. No. 40 at ¶¶63, 67; Dkt. No. 40-1 at 73.

On March 20, 2022, a lieutenant told a nurse that the plaintiff had reported that his penis hurt, and he was unable to urinate for two days. Dkt. No. 40 at ¶68; Dkt. No. 40-1 at 2. The nurse suggested a catheter, but the plaintiff refused; he said he had been able to urinate "a little" but did not need "to be seen right now" and "just want it documented because [another nurse] said to let you guys know anytime I have pain." Dkt. No. 40-1 at 2. The plaintiff saw another nurse the next day, complained about the antibiotics he had received and said he felt "like there is something else going on." Id. at 22–23. The nurse prescribed over-the-counter aids for constipation and consulted with an advanced practice nurse prescriber, who ordered an ultrasound on the

plaintiff's abdominal wall and groin. Id. at 25. The nurse prescriber also ordered another urinalysis, which was negative for infection. Id.; Dkt. No. 40-2 at 33–34. Dr. Ribault avers that the plaintiff underwent the ultrasound of his abdomen and right groin on March 24, 2022, and both showed normal results. Dkt. No. 40 at ¶74. But the page of the plaintiff's medical records that he cites in support of these results is not in the record. Id. (citing "HSU336").

On March 28, 2022, the plaintiff asked a correctional officer to call the HSU because he was experiencing pain in his abdomen, penis and leg. Dkt. No. 40-1 at 44. Nurse McCullen advised the plaintiff to submit a request to be seen in the HSU and reminded him that he had a provider appointment the next day, an offsite urology appointment on April 11, 2022 and had been seen in the HSU for the same issues three days earlier. Id. at 44–45. Dr. Ribault saw the plaintiff the next day, and the plaintiff reiterated his complaints of pain. Dkt. No. 40 at ¶79; Dkt. No. 40-1 at 57–58. Ribault reviewed the plaintiff's CT and ultrasound results, both of which were normal, and reminded the plaintiff that he had an upcoming offsite urology appointment. Dkt. No. 40 at ¶79; Dkt. No. 40-1 at 57–58. Ribault says he ordered an x-ray for the plaintiff's newer complaints of low back pain, the plaintiff underwent the x-ray on April 6, 2022 and the results were normal. Dkt. No. 40 at ¶¶80–81. He again cites "HSU336," which is not in the record. Id. HSU staff performed another urinalysis on April 4, 2022 and the results were negative. Dkt. No. 40-2 at 30.

On April 11, 2022, the plaintiff had an offsite urology appointment, and the urologist performed a cystoscopy procedure to look inside the plaintiff's

urethra and bladder. Dkt. No. 40 at ¶83; Dkt. No. 40-2 at 7–13. The results of the procedure were "mostly negative," and the doctor recommended Ciprofloxacin, an antibiotic for "preventative purposes" and a follow-up in eight weeks. Dkt. No. 40 at ¶¶84–85; Dkt. No. 40-2 at 9–10. Dr. Ribault says he understood the "mostly negative" results to mean there was no objective explanation for the plaintiff's pain, and "the work-up was normal." Dkt. No. 40 at ¶86. The same day, a nurse entered an order for Ciprofloxacin, as the urologist recommended. Dkt. No. 40-1 at 72.

On May 18, 2022, the plaintiff submitted a request to the HSU asking to speak with Dr. Ribault and noting that his Ciprofloxacin was almost completed, but it had not helped. Dkt. No. 40-3 at 8. The HSU received the plaintiff's request the next day, and Ribault saw him then. Id. Ribault advised the plaintiff to continue to follow his urologist's plan of care, which was to discuss his symptoms with the urologist at his follow-up. Dkt. No. 40-1 at 57.

But the day after that appointment (May 20, 2022), the plaintiff saw a nurse for continued complaints of pain in his penis, testicle and pelvis. Id. at 20–22. The nurse consulted Dr. Ribault, who decided not to prescribe a probiotic but changed the plaintiff's antibiotic prescription to Bactrim. Id. at 21–22, 72. Ribault saw the plaintiff three days later about his pelvic pain. Id. at 55–56. The plaintiff reported "significant improvement in his pain a few days after beginning the Bactrim" and "improvement with the burning pain with urination and with an erection." Id. at 56. Ribault advised the plaintiff to

complete his course of medication and reminded him about his upcoming urology follow-up appointment. Id.

Dr. Ribault avers that on June 9, 2022, the plaintiff saw Karen Molitor, an offsite advanced practice nurse prescriber, for his urology follow-up. Dkt. No. 40 at ¶94. He says that Molitor attributed the plaintiff's symptoms to chronic prostatitis and an overactive bladder and prescribed him Bactrim because he expressed relief when taking it. Id. at ¶¶94–96. Ribault says Molitor prescribed ibuprofen and recommended that the plaintiff avoid "bladder irritants." Id. at ¶96. The pages of the plaintiff's medical records that Ribault cites related to this appointment are not in the record. Id. at ¶¶94–96 (citing "HSU237-247"). But his records do show that HSU staff, including Ribault, entered orders for the prescriptions that Molitor recommended. Dkt. No. 40-1 at 71–72.

On June 19, 2022, the plaintiff saw a nurse for complaints of pain in his penis and testicle. Id. at 17–18. He told the nurse that the Bactrim "was helping [but] now the pain is worse then [sic] ever." Id. at 18. The nurse sent a message "to MD with update." Id. at 19. The next day, the plaintiff saw a different nurse and asked to be tested for gonorrhea. Id. at 14–15. He was adamant that he had not had sexual intercourse in prison but "had unprotected sex with two people right before [he] came in and [he] started having the symptoms a little bit after." Id. at 15. The nurse advised the plaintiff against self-diagnosing and assured him that he had been tested for sexually transmitted diseases, all of which were negative. Id. She reported that the

plaintiff became "argumentative and d[id] not let [her] finish explaination [*sic*] or sentence," so she advised the plaintiff that he would see Dr. Ribault the next day and ended the appointment. Id. On June 30, 2022, Ribault ordered a chlamydia/gonorrhea test, and the results were negative. Id. at 65.

On July 5, 2022, the plaintiff spoke with a nurse about his pelvic and testicular pain and said he did not believe the Bactrim was working anymore. Id. at 43. Two days later, he saw a different nurse for his same complaints and told the nurse he had passed a kidney stone earlier that day, which alleviated pain on his right side. Id. at 10–11. He reported that the pain in his penis also felt better after he passed the kidney stone. Id. at 11. The plaintiff underwent a urinalysis the same day, and it was negative for infection. Dkt. No. 40-2 at 33. A week later, Dr. Ribault ordered Flomax to improve the plaintiff's urination. Dkt. No. 40-1 at 71. He refilled those prescriptions in September 2022. Id. at 70. The plaintiff underwent urinalyses on July 15 and September 14, 2022, both of which were negative. Dkt. No. 40-2 at 32, 34.

On October 12, 2022, Dr. Ribault saw the plaintiff for his final follow-up before the plaintiff was released from Racine. Dkt. No. 40 at ¶111. Ribault reviewed the plaintiff's June 2022 appointment with offsite urology and noted, "It seems that the working explanation for his subjective symptoms has been a chronic nonbacterial prostatitis. However . . . nearly all medications have not helped." Dkt. No. 40-1 at 54. The plaintiff reported that the Flomax did not help, but he had been pain-free for about a month after finishing his course of Bactrim. Id. He said he felt "a fluctuating painful full bladder feeling with a 'hot'

sensation in his penis" and had pain in his pelvis and testicles. Id. Ribault "discussed the challenges of treating symptoms without objective data as well as nonpharmacologic therapies such as hygiene changes, exercise, diet, and relaxation techniques." Dkt. No. 40 at ¶112; Dkt. No. 40-1 at 54–55. He ordered a short course of Bactrim because it was the only medication that the plaintiff said had helped, and he ordered another urology consultation. Dkt. No. 40 at ¶114; Dkt. No. 40-1 at 55.

On October 31, 2022, the plaintiff submitted a request to the HSU noting that Bactrim "was definitely working"; but his symptoms had returned, and he was almost out of medication. Dkt. No. 40-2 at 69. Dr. Ribault responded the next day and asked how long the medication had worked. Id. The plaintiff submitted another HSU request to inform Ribault that his symptoms improved three days after he started taking Bactrim and returned within five days after he finished taking it. Id. at 70. On November 2, 2022, Ribault ordered another prescription of Bactrim. Id. But the plaintiff returned this prescription to the HSU the next day. Dkt. No. 40-1 at 42.

On November 16, 2022, the plaintiff had a follow-up appointment with Molitor, the offsite provider he had seen in June 2022. Dkt. No. 40 at ¶120; Dkt. No. 40-1 at 78–81; Dkt. No. 40-2 at 1–5. Molitor recommended that the plaintiff take Bactrim daily for four months, ibuprofen as needed and Cardura, which is used to treat an enlarged prostate. Dkt. No. 40 at ¶¶123–24; Dkt. No. 40-1 at 78. She also recommended a urine culture, a CT renal stone study and a follow-up appointment in one month. Dkt. No. 40-2 at 2. Dr. Ribault avers

that on November 19, 2022, he filled the prescriptions Molitor recommended. Dkt. No. 40 at ¶124. He does not cite the plaintiff's medical records in support of this statement.

On December 6, 2022, Dr. Ribault put an addendum in his notes from the plaintiff's October 12, 2022 appointment noting that the plaintiff's "pain complaints are chronic and the same." Id. at ¶125; Dkt. No. 40-1 at 54. He continued the plaintiff's treatment plan and wrote that he had no scheduled follow-ups or imaging tests. Dkt. No. 40 at ¶125; Dkt. No. 40-1 at 54.

On December 30, 2022, the plaintiff saw a nurse for his complaints of pain in his penis. Dkt. No. 40-1 at 4–5. He reported taking ibuprofen three times daily (as prescribed) for pain "with minimal to no relief of burning penile pain and painful urination." Id. at 5. The nurse consulted with a nurse prescriber, who ordered AZO tablets for fourteen days. Id. at 6.

On February 14, 2023, the plaintiff was released from Racine to a supervised living facility. Dkt. No. 40 at ¶127.

## II. Discussion

### A. Summary Judgment Standard

A party is entitled to summary judgment if he or she shows that there is no genuine dispute as to any material fact and he or she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over

a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in his or her favor. Brummett v. Sinclair Broad. Grp., Inc., 414 F.3d 686, 692 (7th Cir. 2005).

B.    Eighth Amendment

As the court explained in the screening order, the Eighth Amendment governs the plaintiff's claim that the defendants were deliberately indifferent to his serious medical needs. See Estelle v. Gamble, 429 U.S. 97, 104 (1976). An Eighth Amendment claim consists of both objective and subjective components. Farmer v. Brennan, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must show that he "is incarcerated under conditions posing a substantial risk of serious harm." Id.

In the context of a claim that prison staff were deliberately indifferent to a plaintiff's serious medical need, the objective component requires the plaintiff to show that his medical need constituted a risk of an objectively serious harm. Stewart v. Wexford Health Sources, Inc., 14 F.4th 757, 763 (7th Cir. 2021) (citing Balsewicz v. Pawlyk, 963 F.3d 650, 654 (7th Cir. 2020)). "A medical condition is deemed to be serious if it may be 'life threatening or pose[s] a risk

24

of needless pain or lingering disability if not treated at once.'" <u>Karraker v.</u> <u>Peters</u>, 65 F.3d 170 at *3 (7th Cir. 1995) (citing <u>Davis v. Jones</u>, 936 F.2d 971, 972 (7th Cir. 1991)).

To satisfy the subjective component, the plaintiff must demonstrate that the defendants had a "sufficiently culpable state of mind." <u>Farmer</u>, 511 U.S. at 834. A prison official shows deliberate indifference when she "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." <u>Perez v. Fenoglio</u>, 792 F.3d 768, 776 (7th Cir. 2015) (citing <u>Farmer</u>, 511 U.S. at 837). "The standard of deliberate indifference 'requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk.'" <u>Stewart</u>, 14 F.4th at 763 (quoting <u>Huber v. Anderson</u>, 909 F.3d 201, 208 (7th Cir. 2018)). The evidence must show the defendants' "actual, personal knowledge of a serious risk, coupled with the lack of any reasonable response to it." <u>Ayoubi v.</u> <u>Dart</u>, 724 F. App'x 470, 474 (7th Cir. 2018) (citing <u>Farmer</u>, 511 U.S. at 837, 844–45).

For a claim of deliberate indifference against a medical provider, the subjective component requires the plaintiff to show that the medical professional's treatment decision was "so inadequate that it demonstrated an absence of professional judgment." <u>Stewart</u>, 14 F.4th at 763 (quoting <u>Johnson</u> <u>v. Dominguez</u>, 5 F.4th 818, 826 (7th Cir. 2021)). Put another way,

> "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" [*Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)] (quoting *Sain v. Wood*, 512 F.3d 886, 894–

95 (7th Cir. 2008)). "To infer deliberate indifference on the basis of a [medical professional's] treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).

Id.

    C.   <u>Analysis</u>

As the court has explained, many of the defendants' proposed facts cite portions of the plaintiff's medical records that either do not say what the proposed fact says they do or are not in the record at all. In places the court has had to piece together support for the defendants' arguments by searching their exhibits by keywords, dates or other signifiers. The court is not obligated to wade through the defendants' exhibits to determine which pages, if any, support a proposed fact, and the defendants cannot expect the court to do so. <u>See</u> Fed. R. Civ. P. 56(c)(3); <u>Jordan v. Block</u>, No. 21-CV-1473, 2023 WL 6318742, at *3 (E.D. Wis. Sept. 28, 2023) (citing <u>Gross v. Town of Cicero, Ill.</u>, 619 F.3d 697, 702 (7th Cir. 2010)). Even with these deficiencies, however, the court finds that the evidence the defendants correctly cite and include with their summary judgment materials shows that the defendants are entitled to judgment as a matter of law.

The court previously determined that the plaintiff's medical concerns satisfied the objective component of an Eighth Amendment claim. Dkt. No. 13 at 7. The defendants concede that the plaintiff's medical needs, "even if they were not prostatitis, were sufficient to satisfy the first prong of a deliberate indifference claim." Dkt. No. 38 at 22. The question is whether the evidence

shows that the defendants were aware of but deliberately indifferent to that serious medical need.

### 1.    *Drs. Kuber and Ribault*

The undisputed evidence shows that Dr. Kuber treated the plaintiff only twice before she resigned from Racine in June 2021. She first saw him on April 20, 2021. The evidence shows that, contrary to the plaintiff's allegations, Kuber reviewed the plaintiff's medical history, ordered tests to determine the cause of his pain, updated his medications based on his reports of their effectiveness and opined on a possible diagnosis for his symptoms. Kuber saw the plaintiff once more, on June 14, 2021. She informed him that the results of the lab tests she had ordered in April were normal, and she discussed the plaintiff's concerns about anxiety and how it could be contributing to his symptoms. This evidence shows that Kuber established a baseline for the plaintiff's health because he was a new patient, considered potential causes for his pain and other symptoms and ordered tests and prescriptions to address those symptoms. This evidence does not support a conclusion that Kuber dismissed the plaintiff's concerns or was indifferent to his medical issues in the two visits she had with him between in April and June 2021.

The undisputed evidence shows that Dr. Ribault addressed the plaintiff's concerns repeatedly and ordered various tests, medications and assessments to determine the cause of his pain and other symptoms. Ribault did not immediately suggest offsite consultations when he believed the plaintiff's conditions could be addressed with medication. But he sent the plaintiff to

offsite urologists when the treatment options he prescribed proved unsuccessful and when his options for treatment at the institution had been exhausted. Ribault followed the offsite providers' recommendations and considered alternative options depending on the plaintiff's reported symptoms. The evidence shows that the plaintiff saw an offsite urologist four times and underwent ultrasounds, an x-ray, a cystoscopy, a CT scan and other lab tests. Ribault even ordered tests he believed were unnecessary—such as a Prostate Specific Antigen test and tests for chlamydia/gonorrhea—because the plaintiff insisted that he had certain conditions. Ribault explained to the plaintiff on multiple occasions that his symptoms were non-specific, meaning they kept changing, which made the plaintiff's condition very difficult to treat. But Ribault continued to treat the plaintiff, trying different medications and methods to address his symptoms. There is no evidence that Ribault refused to see the plaintiff, unnecessarily delayed sending him to an offsite specialist or otherwise disregarded his condition.

The undisputed evidence shows that both doctors addressed the plaintiff's complaints, ruled out conditions based on his symptoms and prescribed medication in line with what they believed was causing his prostate issues and pain. The evidence shows that the doctors made reasoned medical decisions based on the plaintiff's varied and changing complaints and symptoms, the results of the tests they had him undergo and his response to their varying treatments. Even if they did not provide what the plaintiff thinks was the best possible course of treatment, the doctors' reasoned medical

determinations cannot be considered deliberate indifference. See Zaya v. Sood, 836 F.3d 800, 805 (7th Cir. 2016) ("By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment."); Forbes v. Edgar, 112 F.3d 262, 267 (7th Cir. 1997) ("Under the Eighth Amendment, [a plaintiff] is not entitled to demand specific care. [He] is not entitled to the best care possible. [He] is entitled to reasonable measures to meet a substantial risk of serious harm to h[im]."). Drs. Kuber and Ribault are entitled to judgment as a matter of law.

2.    *Nurse McCullen*

The undisputed evidence shows that the plaintiff infrequently saw Nurse McCullen for his complaints related to the issues addressed in this lawsuit. The evidence shows that during the May 21, 2021 visit that the plaintiff addresses in his amended complaint, the plaintiff refused to pay the copay for the visit, so McCullen reminded the plaintiff of his upcoming appointment with his provider. The plaintiff saw McCullen on June 7, 2021, but as the court has explained, McCullen's complete notes from this visit are not in the record. See Dkt. No. 40-1 at 36–37. The pages that are in the record show that McCullen reviewed the plaintiff's symptoms and addressed his concerns. Dr. Kuber avers that McCullen also noted that the plaintiff had recently seen her for the same issue and she advised the plaintiff "to stop masturbating, avoid getting soap in his urethra, and reminded [him] he had a provider appointment within the next two weeks." Dkt. No. 41 at ¶25.

The plaintiff alleged that he saw Nurse McCullen on July 14, 2021, but McCullen allegedly refused to listen to the plaintiff's complaints, sent him back to his unit without treatment and noted in the plaintiff's medical chart that "his symptoms were related to masterbating [*sic*] which was untrue." Dkt. No. 26 at ¶¶21–24. The defendants do not discuss this incident. But McCullen's progress notes from this interaction are in the record. Dkt. No. 40-1 at 49–50. Those notes show that McCullen noted that the plaintiff had been seen four times in the previous few months for his same complaints, and that he had two upcoming doctor appointments in July and August 2021. Id. at 50. McCullen noted that the plaintiff "states his symptoms are related to masturbating. Pt [patient] should stop masturbating and have his issue addressed by a provider when there is objective data to be concerned about." Id. Only a few months earlier, the plaintiff had told Dr. Kuber that he thought his issue was "related to him over masturbating in the county jail." Dkt. No. 41 at ¶11; Dkt. No. 40-1 at 62. McCullen's notes suggest that he was low on patience, but he did not provide "untrue" information in his nursing note. The plaintiff also alleged that on August 10, 2021, McCullen burst into an exam room, yelled at him and threatened to have an officer come into the room. Dkt. No. 26 at ¶29. There is no evidence of this interaction in the plaintiff's records, nor is there evidence suggesting that the plaintiff saw McCullen on August 10, 2021.

This evidence does not support a conclusion that McCullen disregarded the plaintiff's complaints or issues. It shows a nurse advising a challenging patient with persistent complaints. McCullen responded immediately to the

plaintiff's HSU requests, saw him in person (except when the plaintiff refused to pay the copay) and addressed his concerns. He reminded the plaintiff to follow his provider's instructions, updated him on his recent exams and test results and advised him to address his changing concerns with his provider. Given the limited interventions available to nurses at Racine, it appears that McCullen did not offer additional treatment because there was nothing more he could do.

The only evidence suggesting that McCullen "burst into" an exam room, threatened the plaintiff with discipline or otherwise acted unprofessionally during medical appointments is the plaintiff's amended complaint. Even if the plaintiff's allegations are true, they suggest that McCullen, at most, may have acted unprofessionally towards the plaintiff or said some things that he should not have. That alleged behavior is not enough to sustain an Eighth Amendment claim. See Lisle v. Welborn, 933 F.3d 705, 719 (7th Cir. 2019) (explaining that prison staff's use of even "[r]epugnant words . . . will seldom rise to an Eighth Amendment violation" because "[r]elationships between prisoners and prison staff are not always marked by genteel language and good manners"). Nurse McCullen is entitled to judgment as a matter of law.

### 3. *State Law Claim*

The court permitted the plaintiff to proceed on a state law claim of medical malpractice. Dkt. No. 25 at 7–8. The court explained that it would exercise supplemental jurisdiction over that claim because it was related to the plaintiff's federal claims. Id. (citing 28 U.S.C. §1367(a)). The court has

concluded that the defendants are entitled to judgment as a matter of law on the plaintiff's federal claims. The court will relinquish supplemental jurisdiction over the state law claim. See 28 U.S.C. §1367(c)(3). The plaintiff may raise that claim in state court, subject to the statute of limitations.

### 4. *Conclusion*

In the screening order, the court explained that "[o]nly unreasonable care that fails to meet a substantial risk of serious harm violates the Eighth Amendment." Dkt. No. 13 at 8. (citing Christopher v. Liu, 861 Fed. App'x 675, 679–80 (7th Cir. 2021); Forbes, 112 F.3d at 267). The court "advise[d] the plaintiff that, to succeed on his claim, he will need to present evidence showing that his treatment was constitutionally inadequate and not merely negligent or different from what he would have preferred." Id.

The plaintiff did not respond to the defendants' proposed facts and did not submit any evidence proving his claims. The defendants' undisputed evidence would not allow a reasonable jury to conclude that any of the three defendants provided unreasonable care that failed to meet the substantial risk of serious harm to the plaintiff. The plaintiff's treatment may have been different from what he wanted, but that is not enough. The defendants are entitled to judgment as a matter of law, and the court will dismiss the case.[1]

---

[1] The defendants argue that if the court declines to grant summary judgment in his favor, they are entitled to qualified immunity. Dkt. No. 38 at 26–28. But "[w]here a defendant 'wins on the facts, [she] does not need qualified immunity.'" Sierra-Lopez v. County, Case No. 17-cv-1222, 2019 WL 3501540, at *10 (E.D. Wis. July 31, 2019) (quoting Viero v. Bufano, 925 F. Supp. 1374, 1387 (N.D. Ill. 1996); and Antepenko v. Domrois, Case No. 17-cv-1211, 2018 WL 6065347, at *6 (E.D. Wis. Nov. 20, 2018)).

## III. Conclusion

The court **GRANTS** the defendants' unopposed motion for summary judgment. Dkt. No. 37.

The court **RELINQUISHES** supplemental jurisdiction over the plaintiff's state law claim. See 28 U.S.C. §1367(c)(3).

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. Pro. 4(a)(5)(A).

If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion in *this court*. See Fed. R. App. P. 24(a)(1). The Court of Appeals may assess the plaintiff a "strike" if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 12th day of June, 2024.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**